# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

IVAN HERNANDEZ,

    Defendant.

Case No. 10-20123

## MEMORANDUM AND ORDER

This matter is before the Court on defendant Ivan Hernandez's motion to suppress evidence (doc. 29), challenging the legality of his arrest on June 18, 2010. Mr. Hernandez moves to suppress statements made to law enforcement officers and evidence obtained subsequent to his arrest. The government responded to Mr. Hernandez's motion on November 8, 2010 (doc. 33). A motion hearing was held by the Court on November 18, 2010, and Mr. Hernandez's motion was taken under advisement. After thoroughly considering the parties' arguments and the evidence, for the reasons set forth below, the Court denies the motion.

## FINDINGS OF FACT

On June 14, 2010, the El Paso County, Texas Sheriff's Office was contacted by the Riverside, California Sheriff's office and told that a confidential human source (CHS) assisting the California Sheriff's office had been approached by a drug trafficking

organization and instructed to transport a large shipment of marijuana from El Paso, Texas to Kansas City, Kansas. The El Paso division of the Federal Bureau of Investigation (FBI) then notified Special Agent Michael Oyler of the FBI's Kansas City division that the CHS truck driver had been instructed to load a shipment of over 4,000 pounds of marijuana at a warehouse in El Paso, Texas and deliver it to Kansas City, Kansas. In addition, the CHS was told to pick up 30,000 pounds of frozen chicken as a "cover load." After loading the shipment on June 16, 2010, the CHS met with Special Agents of the FBI and the Drug Enforcement Administration (DEA) in El Paso to verify the contents of the tractor trailer. Agents found seven pallets of boxes filled with compressed marijuana hidden within the "cover load" of frozen chicken. The marijuana weighed approximately 4,358 pounds.

On June 18, 2010, officers returned a portion of the original load of marijuana to the CHS's trailer to be transported to Kansas City, Kansas for a controlled delivery. While in route, the CHS received a phone call from a local Kansas City number with instructions for delivery of the shipment upon arrival. The CHS later called the same local number and spoke with a man, later identified as Dante Itzcoatl Esteva Pizarro, to select as the meeting point a Lowe's home improvement store parking lot in Kansas City. Aerial and ground surveillance observed a green Grand Prix enter the Lowe's parking lot and two men exit the vehicle, later identified as Dante Pizarro and Jose Angel Loya. Mr. Pizarro and Mr. Loya spoke with the CHS and asked him to follow them to a QuickTrip gas station. Once at the QuickTrip, Mr. Pizarro and Mr. Loya left the CHS but assured

him they would return to lead him to the unloading location.  When Mr. Pizarro and Mr. Loya returned approximately an hour and a half later, Mr. Pizarro entered the cab of the CHS's tractor trailer, and Mr. Pizarro and the CHS followed Mr. Loya to an auto repair shop in Kansas City, Kansas, presumably the location for unloading the marijuana shipment.

Once Mr. Loya's vehicle and the tractor trailer reached the auto repair shop, agents with the FBI and DEA, officers with the Kansas City, Kansas Police Department and officers with the Kansas City, Missouri Police Department arrived at the scene.  Officers conducting surveillance on the ground remained in contact with aerial surveillance.  Officer Keith Witnah, a surveillance pilot with the FBI, observed several men approaching the back of the tractor trailer.  Shortly thereafter, officers invaded the area, and all but one individual began running from the trailer.  The stationary individual was later identified as Jorge Hernandez.  Mr. Loya was captured by Agent Oyler while attempting to climb a 10-foot fence on the south side of the auto repair yard.  Mr. Pizarro fled from the scene and ultimately eluded law enforcement.  At some point officers entered the auto repair shop building on the south side of the auto yard and apprehended Ivan Hernandez when an overhead walkway caved and he fell to the floor.

At the time of Mr. Hernandez's arrest, police seized from his person a cellular telephone and $100 in cash.  Mr. Hernandez later provided written consent to search the telephone, which contained several coded text messages that officers believed to be related to drug activities.  In addition, Mr. Hernandez agreed to speak with agents on June

18, 2010 and again on June 22, 2010 after being read his *Miranda* rights and waiving his rights orally and in writing. Mr. Hernandez admitted meeting with Mr. Loya and Mr. Pizarro earlier in the day on June 18, 2010 at his home, where Mr. Loya paid Mr. Hernandez $100 for license plates. Mr. Hernandez said he then accompanied Mr. Loya and Mr. Pizarro to a QuickTrip parking lot, where Mr. Pizarro spoke with the driver of a tractor trailer parked in the lot. Mr. Pizarro instructed Mr. Loya to take Mr. Hernandez home, but Mr. Loya instead took Mr. Hernandez to an auto repair shop. At the repair shop, Jorge Hernandez exited the shop and was angry with Mr. Loya for bringing Ivan Hernandez along, as "he had nothing to do with it." When Mr. Pizarro arrived at the shop with the CHS and tractor trailer, he was also angry with Mr. Loya for bringing Ivan Hernandez. Mr. Hernandez told agents that at this point, officers appeared on the scene, and he ran from the officers to avoid going to jail.

## ANALYSIS

Mr. Hernandez claims that when he was apprehended by law enforcement on June 18, 2010, he was immediately arrested. Prior to his arrest, Mr. Hernandez was not identified by officers, nor was he seen making any over acts relating to unloading or possessing the marijuana. Mr. Hernandez claims that law enforcement officers therefore did not have probable cause to arrest him, and evidence obtained from him as a result of the illegal arrest should be suppressed.

**1. Initial Encounter**

Courts have recognized three general categories of citizen-police encounters: (1)

consensual encounters, which do not implicate the Fourth Amendment; (2) investigative detentions, which are Fourth Amendment seizures of limited scope and duration and must be supported by reasonable, articulable suspicion of criminal activity; and (3) arrests, the most intrusive of the Fourth Amendment seizures and reasonable only if supported by probable cause. *See United States v. White*, 584 F.3d 935, 944-45 (10th Cir. 2009); *United States v. Fox*, 600 F.3d 1253, 1257 (10th Cir. 2010). An arrest is characterized by the involuntary, highly intrusive nature of the encounter. *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007).

Mr. Hernandez argues that he was immediately arrested when seized by officers on June 18, 2010. As Mr. Hernandez points out, no evidence was presented at the November 18, 2010 hearing to illustrate a delineation between the initial detention of Mr. Hernandez and his subsequent arrest. Rather, the evidence offered suggests that the apprehension of Mr. Hernandez by the officers immediately turned into an arrest. At the hearing, the government offered testimony from Special Agent Michael Oyler, indicating that Mr. Hernandez was questioned by police at the time of his seizure. The government suggests that it was after questioning Mr. Hernandez that officers made the decision to arrest him, as the questioning did not serve to dispel officers' suspicion of Mr. Hernandez's illegal activity. Agent Oyler testified, however, that his understanding of the situation, from details provided to him by the arresting officer, is that Mr. Hernandez was arrested almost immediately upon hitting the ground after falling from the makeshift upper level of the auto shop repair building. Agent Oyler indicated that whether Mr. Hernandez was

initially detained or immediately arrested is a matter of word play, for if in fact Mr. Hernandez was first "detained," he was moments later arrested. It was only after the arrest that officers asked Mr. Hernandez questions typical of an investigative detention. Mr. Hernandez then remained in officers' custody from that point forward.

Notably absent from the November 18th suppression hearing was eyewitness testimony from the officers who were present and responsible for the seizure and arrest of Mr. Hernandez. The only testimony offered by the government was from special agents Keith Witnah and Michael Oyler. At the time of Mr. Hernandez's arrest, Agent Witnah was conducting aerial surveillance of the auto repair yard. Agent Oyler was on the south perimeter of the yard on the other side of a 10-foot fence, primarily focused on apprehending Mr. Loya. Therefore, the testimony presented by Agent Oyler pertaining to the details of Mr. Hernandez's arrest was based solely on his recollection of the facts as previously relayed to him by the arresting officer. Because eyewitness testimony was absent from the hearing, the Court will rely on the facts as relayed by Agent Witnah and Agent Oyler. From this testimony, the Court finds that the encounter between officers and Mr. Hernandez was an immediate arrest.

**2. Burden of Proof**

Mr. Hernandez claims that other than his presence at the scene on June 18, 2010, officers had no reason to believe he committed or was committing a crime. According to Mr. Hernandez, his mere presence was not adequate probable cause for the officers to arrest him. Mr. Hernandez also submits that any facts associating him with illegal

activity were discovered by officers only after his arrest, and are therefore irrelevant for the Court's probable cause inquiry. According to Mr. Hernandez, the government has failed to meet its burden of proof and, as a result, evidence obtained after his arrest must be suppressed. The government insists that the officers in this case had sufficient probable cause to arrest Mr. Hernandez. The totality of the facts and circumstances, taken together with common sense and experience, gave the officers probable cause to seize and arrest Mr. Hernandez.

The Fourth Amendment protects a person's right to be secure against unreasonable seizure. *United States v. Perdue*, 8 F.3d 1455, 1461 (10th Cir. 1993). In order to protect that right, formal arrests or seizures resembling formal arrests must be supported by probable cause. *Id*. (citing *Michigan v. Summers*, 452 U.S. 692 (1981)). The test for probable cause is whether "at that moment the facts and circumstances within the [officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [officer] in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *United States v. Calp*, 113 F. App'x 358, 361 (10th Cir. 2004). Probable cause is evaluated in light of circumstances as they would have appeared to a prudent, cautious, trained police officer. *United States v. Snow*, 82 F.3d 935, 942 (10th Cir. 1996).

It is clear from the parties' submissions and evidence presented at the suppression hearing that law enforcement had legitimate and concrete reason to believe illegal activity was taking place at the auto repair shop on June 18, 2010. Officers knew the tractor
7

trailer was carrying a controlled shipment of marijuana, and throughout the day, officers were in direct contact with the cooperating CHS participating in the delivery. Furthermore, officers conducted continuous aerial and ground surveillance of the CHS's tractor trailer and the interactions between the CHS and individuals riding in a green Grand Prix at the Lowe's and Quick Trip parking lots. The officers then followed the two vehicles to the auto repair shop with the understanding that the CHS was likely being lead to a location for final delivery of the marijuana shipment.

The more difficult and pertinent issue is whether, at the time of Mr. Hernandez's arrest, there was a concrete nexus between the illegal activity taking place at the auto repair shop and Mr. Hernandez's presence at the scene in order to constitute probable cause for his arrest. Probable cause to arrest does not require facts sufficient to establish guilt but does require more than mere suspicion. *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir, 1999). The fact that an officer may think additional evidence would be required to prove a defendant's connection to drug activity does not imply that the officer lacked probable cause to arrest that defendant. *See United States v. Burgess*, 33 F. App'x 386, 388-89 (10th Cir. 2002) (citing *United States v. Watson*, 423 U.S. 411, 423 (1976)). The Court will consider information relayed by one officer to another, but such information must be based on personal knowledge. *Fogarty v. Gallegos*, 523 F.3d 1147, 1157 n.10 (10th Cir. 2008). Neither the officer's subjective belief nor information gleaned post-hoc bear on this inquiry. *Buck v. City of Albuquerque*, 549 F.3d 1269, 1281-82 (10th Cir. 2008).

At the time of Mr. Hernandez's arrest, officers were keenly aware that illegal activity was afoot, as discussed above. In addition, law enforcement stationed on the ground and around the perimeter of the auto yard were informed by aerial surveillance that as the CHS's tractor trailer backed into the gate of the auto yard, 3 or 4 individuals approached the back of the trailer. Agent Whitnah testified that while conducting aerial surveillance, he radioed ground officers to notify them of the 3 or 4 individuals walking from within the auto yard towards the tractor trailer. According to Agent Witnah, these individuals, in addition to the CHS, were the only people within the vicinity of the auto repair yard at the time. Although the auto repair shop was presumably a lawful business open to the public, no customers or additional people were visibly present in the auto repair yard. From his vantage point, Agent Witnah could not identify or describe the individuals gathered at the tractor trailer. Agent Witnah stated that officers raided the scene shortly thereafter, and he saw all but one individual run south through the auto yard. Agent Witnah lost track of the fleeing individuals, for he maintained his focus on the tractor trailer.

Agent Oyler admitted that no pre-surveillance of the auto yard had been conducted but testified that officers relied on aerial surveillance's report that only a few people were in the auto yard. He also conceded that there were no reports that specifically identified Mr. Hernandez as one of the individuals standing at the back of the tractor trailer or fleeing from the scene. Agent Oyler could not personally confirm that there were 3 or 4 people running south, for at the time the officers raided the scene, he was stationed

9

outside of the auto yard perimeter, on the other side of a 10-foot fence. Nor could Agent Oyler confirm the details of Mr. Hernandez's arrest. It was later that Agent Oyler learned from the arresting officer that Mr. Hernandez was apprehended when he fell from an overhead walkway in the auto repair shop building at the south side of the yard. The exact circumstances of Mr. Hernandez's fall were not known by Agent Oyler. After arresting Mr. Hernandez, officers deduced by numbers that all individuals reported by aerial surveillance were accounted for but one individual, Mr. Pizarro. The CHS informed officers that Mr. Pizarro was missing from the group of detainees and must have escaped. No other individuals were identified as missing by the CHS.

Thus, at the time of Mr. Hernandez's arrest, officers had information that a handful of unidentified individuals fled immediately upon officers entering the scene and that the individuals ran south through the auto repair yard. Common sense lead the officers to believe that Mr. Hernandez was one of the few individuals who were on the scene and had fled from officers. Reasonable inferences derived from circumstantial evidence can be adequate to establish probable cause. *See United States v. Burgess*, 33 F. App'x 386, 388-89 (10th Cir. 2002). The building in which Mr. Hernandez was apprehended was located on the south side of the auto repair yard, in the direction the individuals fled as indicated by aerial surveillance. Agent Oyler testified that to reach the south fence of the auto yard, a person would likely pass through the auto repair building. Furthermore, Mr. Hernandez was apprehended after he crashed through a makeshift upper level, where he was apparently attempting to allude detection. He did not appear to be an employee or

customer of the auto repair shop, nor did he offer any legitimate reason for his presence in the building.  These facts known to the officers, when combined, gave the officers more than mere suspicion to believe that Mr. Hernandez was one of the individuals involved in unloading the marijuana shipment and attempting escape from law enforcement.

Additional evidence linking Mr. Hernandez to drug activity was accumulated after Mr. Hernandez's arrest.  While this evidence may be necessary to prove any connection between Mr. Hernandez and illegal activity, it was not needed for the officers to have probable cause to apprehend and arrest Mr. Hernandez.  While there is no direct evidence pinpointing Mr. Hernandez as one of the individuals at the rear of the tractor trailer who tried to escape from law enforcement, officers had reason to believe, from the facts available to them at the time and from their experience, that Mr. Hernandez was involved in the illegal activity.

Based on the totality of the circumstances, the Court concludes that the arrest of Mr. Hernandez was supported by probable cause.  Because Mr. Hernandez was lawfully arrested, evidence subsequently obtained from Mr. Hernandez is not tainted by the arrest.  The evidence, consisting of Mr. Hernandez's statements to police, contents of his cell phone, and money found on his person, are therefore admissible.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's motion to suppress evidence (doc. 29) is denied.

**IT IS SO ORDERED** this 14th day of December, 2010.

                                          s/ John W. Lungstrum
                                          John W. Lungstrum
                                          United States District Judge